FILED IN CHAMBERS
U.S.D.C ATLANTA

Date: Oct 01 2021

KEVIN P. WEIMER, Clerk

By: s/Christopher Boundy
Deputy Clerk

# United States District Court

NORTHERN DISTRICT OF GEORGIA

UNITED STATES OF AMERICA

v.

Jaime Cruz Duarte

**CRIMINAL COMPLAINT**

Case Number: 1:21-MJ-927

I, the undersigned complainant being duly sworn, state the following is true and correct to the best of my knowledge and belief.  On or about September 30, 2021 in Henry County, in the Northern District of Georgia, defendant did, knowingly and willfully combine, conspire, confederate, agree, and have a tacit understanding with others, to violate Title 21, United States Code, Section 841(a)(1), that is to knowingly and intentionally possess with intent to distribute a controlled substance, said act involving at least 500 grams of a mixture and substance containing a detectable amount of methamphetamine, a Schedule II controlled substance

in violation of Title 21, United States Code, Section 846.

I further state that I am a Task Force Officer and that this complaint is based on the following facts:

PLEASE SEE ATTACHED AFFIDAVIT

Continued on the attached sheet and made a part hereof.    Yes

Signature of Complainant
Caleb M. Poole

Based upon this complaint, this Court finds that there is probable cause to believe that an offense has been committed and that the defendant has committed it.  Sworn to before me, and subscribed in my presence

October 1, 2021  at 3:20 PM                                    at   Atlanta, Georgia
Date                                                                                City and State

ALAN J. BAVERMAN
UNITED STATES MAGISTRATE JUDGE
Name and Title of Judicial Officer                               Signature of Judicial Officer

AUSA Rachel Lyons
Rachel.Lyons@usdoj.gov

*Sworn to me by telephone pursuant to Federal Rule of Criminal Procedure 4.1*

ATTEST: A TRUE COPY
CERTIFIED THIS

Date: Oct 01 2021

KEVIN P. WEIMER, Clerk

By: s/Christopher Bou
Deputy Clerk

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Caleb M. Poole, a Drug Enforcement Administration ("DEA") TaskForce Officer, United States Department of Justice, depose and state under penalty of perjury that the following is true and correct to the best of my knowledge and belief:

1. I prepare this Affidavit in support of a criminal complaint against Jaime Cruz DUARTE ("DUARTE,") Antonio Penaloza TORRES ("TORRES,") and Rito Armando Torres GUTIERREZ ("GUTIERREZ") for conspiracy to possess with intent to distribute a controlled substance, said act involving at least 500 grams of a mixture and substance containing a detectable amount of methamphetamine, a Schedule II controlled substance, in violation of 21 U.S.C. § 846.

## INTRODUCTION

2. I am an investigative or law enforcement officer of the United States under Title 18, United States Code, Section 2510(7), that is, an officer of the United States, who is empowered by law to conduct investigations and make arrests for offenses enumerated in 18 U.S.C. § 2516.

3. I am a certified peace officer in the State of Georgia and since January 2019, I have been assigned as a Task Force Officer with the DEA Atlanta-Carolinas High Intensity Drug Trafficking Area ("HIDTA") Group Three. I am a Georgia POST certified law enforcement officer employed by the Georgia Department of Corrections as a Special Agent. I have been employed as a law enforcement officer for approximately 11 years which has included assignments as a Federal Bureau of Investigation Task Force Officer and a Georgia Bureau of Investigation Task Force Officer.

4. During the course of my law enforcement career, I have spoken to, and worked with, more experienced federal, state, and municipal narcotic agents and officers. I have participated in numerous investigations of illicit drug trafficking organizations involving the use of confidential informants, electronic and physical surveillance, the analysis of telephone toll records, investigative interviews, and the service of search and arrest warrants. These investigations include the unlawful importation, possession with intent to distribute, and distribution of controlled substances, as well as the related laundering of monetary instruments, the conducting of monetary transactions involving the proceeds of specified unlawful activities, and conspiracies associated with criminal narcotic offenses, in violation of Title 21, United States Code, Sections 841(a)(1) and 846.

5. I have written and executed numerous search and arrest warrants pertaining to the seizure of all types of criminal evidence such as illegal drugs, drug paraphernalia, drug records, drug proceeds and evidence of other types of crimes, pertaining to the arrest of individuals involved in drug trafficking activities. I have received specialized training in the enforcement of drug laws, with an emphasis on drug trafficking and drug organizations. I have participated in numerous drug investigations and have deployed various investigative techniques during those investigations. I have become familiar with the patterns of activity of drug traffickers, the types and amounts of profits made by drug dealers, and the methods, language, and terms that are used to disguise the source and nature of the profits from illegal drug dealings.

6. I have interviewed drug dealers, users, and confidential informants, and have discussed with them the lifestyles, appearances, and habits of drug dealers and users. I have become familiar with the manner in which

narcotics traffickers smuggle, transport, store, and distribute narcotics, as well as how they collect and launder drug proceeds. I am also familiar with the manner in which narcotics traffickers use telephones, cellular telephone technology, coded communications or slang-filled conversation, false or fictitious identities, and other means to facilitate their illegal activities and thwart law enforcement investigations. I have discussed packaging, preparation, methods of operation, and security measures which are often employed by narcotics traffickers. I have examined records consisting in part of buyer's and seller's lists and pay/owe ledgers. I have also examined documentation of various methods in which methamphetamine and other illegal drugs are produced.

7. Based on my training and experience, and the training and experience of other agents, I know that it is common practice for narcotics traffickers to routinely utilize telephones and cellular telephones, as well as web-based applications, in order to communicate with their customers, suppliers, couriers, and other co-conspirators and in order to insulate themselves from detection by law enforcement. Moreover, it is not unusual for them to initiate such service under the name of an associate or under a fictitious name. Furthermore, it is not unusual for narcotic traffickers to utilize false or incomplete addresses for subscriber information related to their cellular telephone. Therefore, such data often will not be useful to determine the location of a particular cell phone user.

8. Based upon my training and experience, as well as the knowledge and experience of other agents, I am aware that it is generally a common practice for drug traffickers to store their drug inventory and drug related paraphernalia in their residences and vehicles. Furthermore, it is generally a common practice for drug traffickers to maintain their records relating to

their drug trafficking activities. Because drug traffickers in many instances will "front", i.e. give with an expectation of later payment, controlled substances to their clients, or alternatively, will be "fronted" controlled substances from their suppliers, such record- keeping is necessary to keep track of the amounts paid and owed, and such records could also be maintained close at hand so as to readily ascertain certain balances. Additionally, telephone/address listings of clients and suppliers necessarily may be maintained and be immediately available to other drug traffickers in order to efficiently conduct their drug trafficking business. Moreover, it is also a generally common practice for traffickers to conceal at their residences and inside of their vehicles large sums of money, either the proceeds from drug sales or funds to be used to purchase controlled substances. In this connection, drug traffickers typically make use of wire transfers, cashier's checks, money orders, and bulk currency to pay for controlled substances. Evidence of such financial transactions and records relating to income and expenditures of money and wealth in connection with drug trafficking would also typically be maintained in their residences and vehicles.

9. I am also aware from my own experience and training that drug traffickers commonly maintain firearms, ammunition, and other weapons in their vehicles and residence for the purpose of protecting their drug inventory and drug proceeds stored there, not only from law enforcement personnel, but also other drug traffickers who may attempt to "rip" them off. I am also aware that drug traffickers frequently secrete cash proceeds and other evidence for their drug trafficking activities inside locked safes, boxes, or containers that are maintained in the property under their control.

## SOURCES OF INFORMATION

10. The information contained in this Affidavit is based on both my personal knowledge of this case and information relayed to me by other law enforcement authorities and sources of information. The facts set forth below do not reflect all information known to me or other officers regarding this investigation. I simply include the facts necessary to establish probable cause to support the criminal complaints.

## STATEMENT OF PROBABLE CAUSE

11. In May of 2021, agents began investigating a broker involved in the purchase and sale of half-kilogram and kilogram amounts of methamphetamine within the Northern District of Georgia. On September 30, 2021, DEA members traveled to the CVS Pharmacy located at 315 Fairview Rd, Ellenwood, Georgia, 30294, for a controlled purchase of one kilogram of methamphetamine set up by the broker.

12. At approximately 12:10 p.m. the UC contacted the broker at telephone number +57-313-644-0376. At 12:15 p.m. the individual responded asking for the description of the undercover vehicle. Approximately five minutes later, a 2010 blue Volkswagen Jetta with Georgia license plates driven by an unknown Hispanic male, later identified as Jamie Cruz DUARTE, arrived in the parking lot and parked his vehicle next to the UC vehicle. DUARTE exited his vehicle and walked to the front passenger door of the UC vehicle where he provided the agent with approximately one kilogram of methamphetamine in exchange for $4,500.00 dollars Official Advanced Funds

(OAF). The kilogram of methamphetamine provided by DUARTE later fielded-tested positive for methamphetamine.

13. DUARTE got back in the driver seat of his vehicle and left the CVS parking lot. Agents witnessed DUARTE travel to a Chevron gas station where he purchased a bag of ice. Agents then followed DUARTE directly to Lakeside Drive, Ellenwood, Georgia.[1] Once on Lakeside Drive, DUARTE pulled into the cul-de-sac on Lakeside Drive and into a driveway on the right-hand side. A short time, later agents drove through the cul-de-sac and did not observe DUARTE's vehicle. Agents set up surveillance in the area that DUARTE's vehicle was last observed.

14. At approximately 2:30 p.m., agents observed two Hispanic males exit the garage door of the residence located at 195 Lakeside Drive, Ellenwood, Georgia and enter a Nissan Frontier that was parked in front of the residence. Some agents maintained surveillance of the two Hispanic males as they left the residence, while other agents stayed in the area of 195 Lakeside Drive.

15. At approximately 2:33 p.m., Georgia State Patrol Trooper Harman conducted a traffic stop on the Nissan Frontier for a window tint violation and failure to maintain lane at the intersection of Panthersville Road and Penders Ridge Drive. Trooper Harman made contact with the driver and passenger of the vehicle who identified as Antonio Penaloza TORRES and Rito Armando

---

[1] Agents later confirmed that it took approximately five minutes to travel from the meet location to the residence located on Lake Side Drive.

Torres GUTIERREZ, respectively. Neither individual had a valid driver's license. Trooper Harman asked them to exit the vehicle. Both men gave consent to search the vehicle. Trooper Harman asked the occupants to empty their pockets. GUTIERREZ had approximately 2,000 dollars cash in his front pocket and TORRES had approximately 900 dollars cash in his front pocket. Trooper Harmon asked the occupants where they were coming from, to which they stated that they were coming from, and lived in, Morrow, Georgia. Trooper Harmon utilized a K-9 to conduct an open-air sniff of the vehicle; the dog alerted to the presence of narcotics. During the search of the vehicle agents located two wire transfer receipts. According to the receipts GUTIERREZ wired approximately 1,000.00 dollars to a Sonia Sanchez Solorzano located in California.[2]

16. After the Frontier was stopped by Georgia State Patrol, agents observed the garage door open at 195 Lakeside Drive, Ellenwood, Georgia. Agents observed the previously surveilled 2010 Volkswagen Jetta exit the garage and leave the area. The Volkswagen appeared to be driven by DUARTE. While the garage was opened agents observed a second vehicle, a white SUV, in parked in the garage. At approximately 2:41 p.m., Georgia State Trooper Smith conducted a traffic stop on the Volkswagen Jetta for illegal window tint. Trooper Smith made contact with the driver who identified himself as Jaime Cruz DUARTE. During the traffic stop, the undercover agent who

---

[2] Based on my training and experience, I know that California is a common location for narcotics trafficking and the transfer of drugs and/or money.

previously purchased the kilogram of methamphetamine confirmed DUARTE was the courier who sold the one kilogram of methamphetamine.

17. Trooper Smith utilized his K-9 partner to conduct an open-air sniff of the vehicle and the dog gave a positive alert. The vehicle was then searched by law enforcement. During the search, approximately 20,000 dollars was located in a bag located under the driver's seat of the vehicle. The 20,000 dollars were banded together utilizing rubber bands. DUARTE told agents that he did not know who the money belonged to. DUARTE stated that he was going to Roswell or Alpharetta to do construction work.

18. A short time after the traffic stops, Trooper Harmon utilized his K-9 partner to run an open-air sniff on the currency seized from the two traffic stops mentioned above. Trooper Harmon stated that his K-9 partner gave an individual positive alert to each amount of currency seized form DUARTE, TORRES and GUTIERREZ.

19. At approximately 8:25 p.m. a federal search warrant was issued for the residence located at 195 Lake Side Drive, Ellenwood, Georgia.

20. At approximately 8:30 p.m. agents arrived at 195 Lake Side Drive. Agents made entry and secured the residence without incident. There were no individuals inside. Once the residence was secured, agents began to search. The residence had three-bedrooms and two bathrooms. There was little furniture present in the living room or kitchen areas of the home. Agents located approximately 221 kilograms of methamphetamine throughout the

residence, contained in gallon-sized zip-lock bags. In the living room, agents discovered over 100 kilograms of methamphetamine in Rubbermaid containers in the center of the room.

21. The first bedroom appeared to be used as sleeping quarters. Men's clothing was present in the closets and on the floor. There were three twin size mattresses on the floor. There was a semi-automatic handgun with a gold-plated image of the Virgin Mary. Also present in the room were separate wire transfer receipts in the names of DUARTE, GUTIERREZ, and TORRES,[3] an unknown amount of U.S. Currency, a money counter, a drug ledger, and a cellular phone.

22. The second bedroom appeared to be used as a storage area that had two more Rubbermaid containers holding methamphetamine in gallon-sized bags. Inside the closet was a laundry basket that held additional kilograms of methamphetamine. There was approximately 100 kilograms of suspected methamphetamine located in this bedroom.

23. The third bedroom contained acetone containers and a small amount of methamphetamine drying in a Rubbermaid container.[4] In the bathroom connected to this bedroom, there was another kilogram of methamphetamine in a plastic bag hanging above the medicine cabinet to dry.

24. Agents discovered what appeared to be a clandestine methamphetamine

---

[3] Based on my training and experience, I know that drug traffickers often wire their proceeds to other members of the organization.
[4] Acetone is commonly used in the processing of methamphetamine.

laboratory in the common area of the residence, master bedroom, and basement. For example, in addition to the acetone, agents found propane burners in the living room. Upon searching the basement, agents discovered approximately 12 industrial-sized trash bags containing a mixed solid substance. When field-tested, the substance tested positive for methamphetamine. Agents used approximately 75 five-gallon buckets to package the substance located in the basement. The basement also contained what appeared to be a processing area where the methamphetamine may have been separated out of the mixed solid substance.

## CONCLUSION

25. Based on the information above, I submit that there is probable cause to believe that, in the Northern District of Georgia, Jaime Cruz DUARTE, Antonio Penaloza TORRES, and Rito Armando Torres GUTIERREZ did knowingly and willfully conspire to possess with intent to distribute a controlled substance, said act involving at least 500 grams of a mixture and substance containing a detectable amount of methamphetamine, a Schedule II controlled substance, in violation of 21 U.S.C. §§ 846.

**END OF AFFIDAVIT**